## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **MARCUS WADE CUNNINGHAM,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:10cv00277 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Marcus Wade Cunningham, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq*. (West 2003 & Supp. 2010). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Cunningham filed his applications for DIB and SSI on July 20, 2006, alleging disability as of June 30, 2005, due to hypertension, bipolar disorder, an enlarged heart, sleep apnea, diabetes and diabetic neuropathy in his feet. (Record, ("R."), at 88-94, 95-97, 121.) The claims were denied initially and on reconsideration. (R. at 48-53, 56, 57-59, 61-62.) Cunningham then requested a hearing before an administrative law judge, ("ALJ"). (R. at 65.) The hearing was held on December 7, 2007, at which Cunningham was represented by counsel. (R. at 18-43.)

By decision dated February 5, 2008, the ALJ denied Cunningham's claims. (R. at 8-17.) The ALJ found that Cunningham met the nondisability insured status requirements of the Act for DIB purposes through September 30, 2010. (R. at 10.) The ALJ also found that Cunningham had not engaged in substantial gainful activity since June 30, 2005, the alleged onset date. (R. at 11.) The ALJ determined that the medical evidence established that Cunningham suffered from severe impairments, including obesity, diabetes mellitus, sleep apnea and bipolar disorder, but she found that Cunningham did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 11-12.) The ALJ found that Cunningham had the

residual functional capacity to perform medium work that did not require work around hazards or more than occasionally climbing stairs, other than simple, routine tasks, interaction with the public or being around children.[1] (R. at 13-16.) The ALJ found that Cunningham was able to perform his past relevant work as an assembly line worker. (R. at 16.) Thus, the ALJ found that Cunningham was not under a disability as defined under the Act and was not eligible for benefits. (R. at 16-17.) *See* 20 C.F.R. §§ 404.1520(f), 416.920(f) (2010).

After the ALJ issued her decision, Cunningham pursued his administrative appeals, but the Appeals Council denied his request for review. (R. at 1-4.) Cunningham then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2010). The case is before this court on Cunningham's motion for summary judgment filed November 12, 2010, and the Commissioner's motion for summary judgment filed December 14, 2010.

## II. Facts

Cunningham was born in 1963, (R. at 22, 88, 95), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Cunningham graduated from high school. (R. at 23.) Cunningham has past work experience as

---

[1] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If an individual can do medium work, that person also can perform sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2010).

an assembly line work, a grocery bagger/stocker, a car wash attendant, a cashier/food preparation worker, a cashier, a construction worker, a janitor, a retail sales clerk/stock clerk and a material handler. (R. at 38-39, 131-32.)

The medical records show that Cunningham was treated from 2000 to 2002 at Medical Associates of Southwest Virginia, from 2002 to 2005 at Family Health Clinic, Inc., and from 2005 to 2007 at the Free Clinic of Pulaski County for diabetes, hypertension, injuries suffered in an automobile accident, routine illnesses and bipolar disorder. (R. at 209-40, 372-408, 493-94, 559-67, 590-623.) These records show that Cunningham has a history of failing to take his medication for hypertension and diabetes. The record also contains reports from a number of emergency room visits from 1999 to 2007 for complaints ranging from aches and pains to difficulty managing his diabetes and hypertension, to pancreatitis, to a possible heart attack. (R. at 202-04, 283-337, 361-65, 498-510, 521-56, 634-61.) These notes reflect that on September 19, 2003, it was recommended that Cunningham see a psychiatrist for his complaints of anger and depression. (R. at 228.) Cunningham underwent a heart catheterization on July 3, 2006, which showed no significant narrowing of the heart arteries. (R. at 302-03.) The record also shows that Cunningham treated with Dr. Glenn K. Davis, M.D., an ophthalmologist, for a corneal abrasion from February 16, 2006, to January 24, 2007. (R. at 409-49.)

It appears that, over the years, Cunningham has received some sporadic mental health treatment mainly related to previous criminal charges. On January 27, 2004, Cunningham was evaluated by Dr. Gary M. Rooker, D.O., a psychiatrist,

at the request of the Giles County Department of Social Services. (R. at 197-99.) Cunningham related a life-long history of impulsivity, legal problems, mood/affect lability, frequent job changes/difficulty maintaining employment and relationship conflicts. (R. at 197.) Cunningham noted the onset of mood symptoms, including episodes of euphoria with severely depressed mood, as early as age 16. (R. at 197.) Cunningham reported that he had undergone psychological therapy in 1991 and again in 1997 as a result of sexual assault charges. (R. at 197.) Cunningham complained of currently suffering from poor anger management, irritability, lack of energy/motivation, restless motor hyperactivity, sleep disturbance, impaired concentration and mood variability. (R. at 197.) Cunningham stated that Social Services had removed his eight-year-old stepson from the home and placed him in foster care due to multiple altercations with family members, assault and battery, trespassing and obstruction of justice charges against Cunningham. (R. at 197.)

Cunningham reported that he was currently employed part-time at a fast food restaurant. (R. at 198.) He stated that he had quit or been fired from several other recent jobs in the prior two years due to poor attendance and conflicts with supervisors or peers. (R. at 198.) Dr. Rooker stated that Cunningham was generally pleasant and cooperative, his affect was broad, and his mood was dysphoric or mildly depressed. (R. at 198.) Dr. Rooker stated that Cunningham was oriented, but that his judgment regarding interpersonal relationships was impaired. (R. at 198.) Dr. Rooker diagnosed Cunningham with bipolar disorder, type I, most recent episode depressed. (R. at 198.) He prescribed Depakote and continued a prescription for Wellbutrin. (R. at 198.)

Cunningham saw Dr. Rooker again on February 24 and April 6, 2004. (R. at 195-96.) On February 24, Cunningham reported feeling calmer, more stable and less irritable. (R. at 196.) Dr. Rooker increased Cunningham's Depakote dosage and also diagnosed antisocial personality traits rule out disorder. (R. at 196.) On April 6, Cunningham reported that he had been arrested again and charged with stalking. (R. at 195.) Cunningham stated that he was unemployed and planned to file for disability benefits. (R. at 195.) Dr. Rooker stated that Cunningham's mood was dysphoric and depressed, and his affect was constricted. (R. at 195.)

On November 29, 2005, Cunningham sought treatment with Pro Bono Counseling Program. (R. at 281-82.) Cunningham's counselor, Betty Henley, stated that Cunningham reported that his primary problem was anger. (R. at 281.) Cunningham stated that as a result of his anger, he got into several fights in middle school, he could not keep a job, and he has felt hostility toward his mother since childhood. (R. at 281.) Cunningham reported so much anger and hostility toward his mother that "he could piss on her grave." (R. at 281.)

Henley also stated that Cunningham's sexual impulsivity needed clinical attention. (R. at 281.) Cunningham told her that he had gone to a local college, approached a woman who was sunbathing, pulled down her bikini bottom and touched her buttocks. (R. at 281.) He stated that later that same year, he saw a woman walking in a park and approached her and cupped her breasts in his hands. (R. at 281.) Cunningham admitted to inappropriately acting out with another college student. (R. at 281.) He stated that in 1995 he slipped up behind a woman in a laundry and started feeling her breasts; he was convicted of criminal charges

for this assault. (R. at 281.)  Cunningham admitted to previously being convicted of sexual battery on his stepson, who was removed from the home and placed in foster care. (R. at 281.) He stated that he is on the sexual offender's list. (R. at 281.)  Cunningham also stated that he was on probation for drunk driving. (R. at 281.) Cunningham stated that he was unemployed. (R. at 281.)

Henley stated that Cunningham was oriented and appeared shy and nervous. (R. at 282.) She stated that Cunningham expressed anger toward his mother. (R. at 282.) She stated that Cunningham's insight was poor. (R. at 282.) Henley diagnosed bipolar disorder, type I, manic, moderate in severity, antisocial personality disorder and a need to rule out pedophilia. (R. at 282.)  Henley placed Cunningham's Global Assessment of Functioning,[2] ("GAF"), score at 31.[3] (R. at 282.) Henley stated that Cunningham's goals were to reduce anger toward mother and other women, to establish appropriate behavior toward women and children, to work on parenting skills, to attain a job and hold it and to maintain probation boundaries. (R. at 282.)   She recommended weekly counseling and continuing medication. (R. at 282.)

Hensley met with Cunningham on eight occasions from January 3 through June 19, 2006. (R. at 271-79.) On January 3, 2006, Cunningham reported that it

---

[2]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[3] A GAF score of 31 to 40 indicates "[s]ome impairment in reality testing or communication ... OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. ..." DSM-IV at 32.

was anger at and rejection by his mother that caused him to impulsively act out by touching women inappropriately on the breasts and buttocks. (R. at 279.) On March 14, 2006, Cunningham stated that it was his stepson's father who had abused his stepson and not him. (R. at 276.) Henley stated "[h]elped [Cunningham] to see that possibly child got mixed up telling his story to the police concerning his abuser." (R. at 276.) On March 21, 2006, Henley stated that much of Cunningham's "behavior appears to be a result of his mother's rejection, mistreatment, control [and] nagging." (R. at 275.) She also stated that Cunningham lived at home until he was 35 in an effort to "conquer his mother's rejection." (R. at 275.)

On April 11, 2006, Henley and Cunningham discussed the wisdom of Cunningham allowing a woman and her eight-year-old son to reside in the home with his family. (R. at 274.) Henley told Cunningham that she believed the situation could pose a problem for him based on his history. (R. at 274.) On April 18, 2006, Cunningham was concerned that someone had called Social Services to report that the woman and child that were living with him. (R. at 273.) Henley assured Cunningham that her office had not contacted Social Services. (R. at 273.) Henley counseled Cunningham on the need to be compliant with his conditions of probation. (R. at 273.) Cunningham stated that, while he could have no contact with his stepson, the court had not ordered that he was not to have any contact with other children. (R. at 273.) Cunningham stated that he had pleaded guilty to abusing his stepson in an effort to prevent his stepson from having to go to court. (R. at 273.) He stated that he was afraid that his stepson had been coached to say that he had abused him and that he did not want to go to jail for 30 years. (R. at

273.) On June 19, 2006, Henley stated that Cunningham had not returned to counseling, and services were terminated. (R. at 271.)

On October 4, 2006, E. Hugh Tenison, Ph.D., a state agency psychologist, completed a Mental Residual Functional Capacity Assessment for Cunningham. (R. at 357-58.) Tenison stated that Cunningham was moderately limited in his ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, and to set realistic goals or make plans independently of others. (R. at 357-58.) Tenison stated that Cunningham was not significantly limited in his ability to perform all other functional areas. (R. at 357-58.)

On February 22, 2007, Robert W. Smith, Ph.D., a licensed clinical psychologist, performed a consultative psychological evaluation on Cunningham. (R. at 453-58.)  Smith found Cunningham to be oriented to time, date, place and situation. (R. at 454.)  Smith reported that Cunningham was cooperative and outgoing. (R. at 454.) Cunningham's thought processes were logical and goal-

directed. (R. at 454.) Cunningham's attention and concentration appeared adequate, but his judgment and insight appeared limited. (R. at 454.)

Cunningham reported leaving or being fired from a number of jobs over the years for being unable to get along with his co-workers. (R. at 455.) Cunningham reported suffering from mood swings and that he had been previously diagnosed as being bipolar. (R. at 455.) Smith diagnosed Cunningham as suffering from a mood disorder, not otherwise specified. (R. at 457.) Smith stated:

> …Cunningham appears moderately capable of functioning in an appropriate and accommodating work setting at this time. He is likely to be able to perform both simple and complex tasks, particularly if provided with adequate time and tools. While his social irritability and discomfort may lead to a lack of motivation to attend work and perform his activities consistently, there are likely some jobs he could perform which would not trigger significant discomfort. The job he worked in the past involved working in close quarters with many co-workers, which would almost surely make it more likely that he would have serious conflicts with co-workers. Jobs which would be more appropriate for … Cunningham include those which require him to work only with one or two trusted co-workers, or perhaps even alone. He is unlikely to require more supervision than a typical worker. He is likely able to complete a normal workday or workweek without interruptions resulting from his psychiatric condition, with the exception of conflicts with co-workers, which can be controlled.

(R. at 457.)

On March 6, 2007, Louis Perrott, Ph.D., a state agency psychologist, completed a Mental Residual Functional Capacity Assessment for Cunningham. (R. at 466-68.) Perrott stated that Cunningham was moderately limited in his

ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness and to set realistic goals or make plans independently of others. (R. at 466-67.) Perrott stated that Cunningham was not significantly limited in his ability to perform all other functional areas. (R. at 466-67.)

On March 6, 2007, Dr. Thomas Phillips, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Cunningham based on his review of the medical records. (R. at 459-65.) Dr. Phillips stated that Cunningham could occasionally lift and carry items weighing up to 50 pounds and frequently lift and carry items weighing up to 25 pounds. (R. at 460.) Dr. Phillips stated that Cunningham could stand and/or walk for up to six hours and sit for up to six hours in and eight-hour workday. (R. at 460.) Dr. Phillips stated that Cunningham's ability to push and/or pull was unlimited. (R. at 460.) Dr. Phillips stated that there were no postural, manipulative visual or communicative limitations established. (R. at 461-62.) He did state that Cunningham should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation and hazards such as machinery and heights. (R. at 462.)

On November 8, 2007, Nancy O'Neill, F.N.P.-C. with the Free Clinic of Pulaski County, completed a form assessment on Cunningham's condition. (R. at 622-23.) From a review of the medical reports, it appears that O'Neill last saw Cunningham at the Free Clinic on August 27, 2007, but the record does not contain any evidence that she routinely provided care for Cunningham after July 2006. (R. at 398-99, 590.) On the assessment form, O'Neill stated that Cunningham suffered from diabetes, hypertension, bipolar disorder, sleep apnea, proteinuria, hyperlipidemia and gastroesophogeal reflux disease. (R. at 622.) O'Neill stated that Cunningham could sit and stand/walk for less than two hours in an eight-hour workday. (R. at 622.) She stated that Cunningham could never lift or carry items weighing 50 pounds, occasionally lift or carry items weighing 20 pounds and frequently lift and carry items weighing 10 pounds or less. (R. at 622.) O'Neill stated that Cunningham experienced pain or other symptoms severe enough to interfere with his attention and concentration, and she added that he was disorganized, forgetful and had difficulty managing activities of daily life. (R. at 622.) She stated that Cunningham frequently experienced pain or other symptoms severe enough to interfere with his attention and concentration. (R. at 622.) O'Neill did not list any findings or conditions that were the cause of these restrictions. (R. at 622-23.) O'Neill stated that Cunningham experienced good days and bad days and was likely to be absent from work more than four times a month. (R. at 623.) She also stated that Cunningham had been diagnosed with diabetes related neuropathy, but did not state where the neuropathy affected Cunningham. (R. at 623.)

On November 19, 2007, Pamela S. Tessnear, Ph.D., a licensed clinical psychologist, performed a consultative evaluation of Cunningham. (R. at 625-33.) Cunningham told Tessnear that he had a history of bipolar disorder. (R. at 625.) He stated that he had never been psychiatrically hospitalized, but that he had attempted suicide once in 1993 by overdosing on his blood pressure medication. (R. at 625-26.) Cunningham related a history of sporadic mental health treatment related mainly to prior legal charges. (R. at 626.) Cunningham stated that he became nervous in large groups of people. (R. at 626.)

Cunningham stated that he had worked at a number of jobs over the years. (R. at 627.) Cunningham said that he had a history of conflicts with co-workers and supervisors and was fired from many of these jobs. (R. at 627.) Cunningham also related a history of interpersonal conflicts with family members and strangers. (R. at 629.) Cunningham stated that he believed that the only reason he was not currently having interpersonal conflicts was because he was not working. (R. at 629.) Cunningham said that he was very irritable and impatient and had a bad temper. (R. at 629.)

Tessnear administered the Personality Assessment Inventory, ("PAI"), and stated that Cunningham gave a good effort and that the results were valid. (R. at 629-30.) Cunningham's depression and anxiety scores were elevated, suggesting tension, nervousness and unhappiness. (R. at 630.) Cunningham's mania score was within normal limits, raising question as to whether he truly suffered from bipolar disorder. (R. at 630.) Cunningham's antisocial features scores showed evidence of hostility, impulsivity and a history of reckless behavior. (R. at 630.) Tessnear also

said that the score showed a pattern consistent with a history of antisocial behaviors and a willingness to engage in high-risk activities for the stimulation. (R. at 630.) Cunningham's aggression score supported a finding that he is easily frustrated and angered and prone to abusive verbal outbursts. (R. at 630.) Tessnear also stated that Cunningham's results showed that he was likely to avoid close contact and did not desire social interaction. (R. at 630.)

On mental status exam, Tessnear found Cunningham to be cooperative but guarded in his responses. (R. at 630.) Cunningham's mood was within normal limits, but his range of affect was restricted. (R. at 631.) He was oriented to person, place and date. (R. at 631.) Cunningham was attentive and focused, and his long-term memory was intact. (R. at 631.) His stream of thought was logical and organized. (R. at 631.) Tessnear diagnosed Cunningham with the need to rule out bipolar disorder and with a history of pedophilia. (R. at 631.) She placed his then-current GAF score at 55.[4] (R. at 632.)

Tessnear stated that Cunningham was likely to become involved in conflict with supervisors, co-workers or the public. (R. at 633.) She stated that he should not work near children or without direct supervision. (R. at 633.) "His impairments of social functioning are marked," she stated. (R. at 633.) Tessnear also limited Cunningham to simple and repetitive tasks. (R. at 633.)

_____

[4] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning...." DSM-IV at 32.

## III.  Analysis

The Commissioner uses a five-step process in evaluating SSI and DIB claims.  *See* 20 C.F.R. §§ 404.1520, 416.920 (2010); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work.  *See* 20 C.F.R. §§ 404.1520, 416.920.  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2010).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner.  To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy.  *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2010); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Cunningham argues that the ALJ's finding that he could return to his past work as an assembly line worker is not supported by substantial evidence. (Memorandum In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 3.)  In particular, Cunningham argues that the ALJ erred by failing to provide a specific finding of the physical and mental demands of his past relevant work, by improperly rejecting the opinion of a consultative psychologist and by failing to pose a proper hypothetical to the vocational expert. (Plaintiff's Brief at 3, 5, 11-12.)  As stated above, the ALJ found that Cunningham had the residual functional capacity to perform medium work that did not require work around hazards or more than occasionally climbing stairs, other than simple, routine tasks, interaction with the public or being around children. (R. at 13-16.) Based on this finding, the ALJ further found that Cunningham was able to perform his past relevant work as an assembly line worker. (R. at 16.)  Based on my review of the record, I agree with Cunningham that the ALJ's finding that he could perform his past relevant work as an assembly line worker is not supported by substantial evidence.

I find no error in the ALJ's weighing of the medical evidence regarding Cunningham's physical residual functional capacity. The ALJ rejected the assessment of nurse practitioner O'Neill. (R. at 15.) The ALJ rejected O'Neill's opinion based on two reasons: 1) O'Neill is a nurse practitioner and not a physician; and 2) her opinion was not consistent with the medical evidence of record. The ALJ is entitled to give less weight to opinions from providers who are not recognized as acceptable sources of medical evidence of impairment. *See* 20 C.F.R. §§ 404.1513, 416.913 (2010). Furthermore, the ALJ may reject medical

opinions, even those from treating sources, if the opinions are not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2010). In this case, the ALJ noted that there was no objective evidence of an impairment that would so severely limit Cunningham's ability to sit. (R. at 15-16.) The ALJ further found that Cunningham was healthy when he took his medication as prescribed and was compliant with medical treatment. (R. at 16.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

A vocational expert, John Neumann, testified at Cunningham's December 7, 2007, hearing. (R. at 37-42.) Neumann testified that Cunningham's past relevant work as a truck thug assembler was medium and unskilled work and as an assembler was light[5] and unskilled work. (R. at 38.) The ALJ asked Neumann to assume a hypothetical person of Cunningham's age, education and past work experience who retained the residual functional capacity to lift and carry items weighing up to 50 pounds occasionally and up to 25 pounds frequently. (R. at 39.) The ALJ also asked Neumann to assume that this hypothetical individual could stand and walk for six hours in an eight-hour workday, sit for six hours in an eight-hour workday and occasionally climb stairs and ramps. (R. at 39.) According to the ALJ's hypothetical, this individual could not perform work that exposed him to polluted environments, respiratory irritants or extreme temperature changes, that required working around hazards such as unprotected heights, climbing ladders,

---

[5] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, he also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2010).

ropes and scaffolds, more than simple, unskilled, repetitive tasks, working with children or more than occasional interaction with the general public. (R. at 39.)

When the ALJ asked Neumann whether such an individual could perform any of Cunningham's past relevant work. Neumann responded: "Yes ma'am, the … a *filler* job at the light exertional level would be within the parameters of your hypothetical. …[T]hat's probably the only one if … at least one component of your hypothetical I think would rule out the other jobs." (R. at 39.) The problem with this testimony is that Neumann never identified a "filler" job among Cunningham's past relevant work experience. (R. at 38-39.) Whether this represents a typographical error or transcription error, I cannot determine. As is, this testimony does not provide any evidence to support the ALJ's finding that Cunningham could perform his past relevant work as an assembler.

Also, the hypothetical the ALJ outlined for the vocational expert did not accurately set forth her findings as to Cunningham's residual functional capacity. In particular, the ALJ found that Cunningham could not perform work that required interaction with the general public. (R. at 13.) The hypothetical presented to the vocational expert asked him to assume that Cunningham could not perform work that required more than occasional interaction with the general public. (R. at 39.)

"In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all ... evidence in the record, ... and it must be in response to proper hypothetical questions which fairly set out all of claimant's

impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citations omitted). The Commissioner may not rely upon the answer to a hypothetical question if the hypothesis fails to fit the facts. *See Swaim v. Califano*, 599 F.2d 1309 (4th Cir. 1979).

Cunningham also argues that substantial evidence does not support the ALJ's rejection of the opinions of the consultative psychologist. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997). While an ALJ may disregard the certain medical or psychological opinions, she is not free to simply disregard uncontradicted expert opinions in favor of her own opinion on a subject that she is not qualified to render. *See Young v. Bowen*, 858 F.2d 951, 956 (4th Cir. 1988); *Wilson v. Heckler*, 743 F.2d 218, 221 (4th Cir. 1984).

Even if the ALJ was justified in rejecting Tessnear's opinions regarding Cunningham's mental residual functional capacity, the uncontradicted psychological evidence places additional restrictions of Cunningham's work-related mental abilities. Every psychological expert who has addressed the issue has placed some restriction on Cunningham's ability to work with co-workers. Smith stated that, based on Cunningham's history of conflict with co-workers, Cunningham should be expected to work with only one or two trusted co-workers. Tenison, a state agency psychologist, stated that Cunningham's ability to work in coordination with or close proximity to others without being distracted by them

and his ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes were moderately limited, and his abilities to accept instructions and respond appropriately to criticism from supervisors were moderately limited. Perrott, another state agency psychologist, agreed.

Based on the above, I find that substantial evidence does not exist in the record to support the ALJ's finding as to Cunningham's mental residual functional capacity. I recommend that the court deny Cunningham's and the Commissioner's motions for summary judgment, vacate the decision of the Commissioner denying benefits and remand this case to the Commissioner for further development consistent with this decision.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence does not exist in the record to support the ALJ's finding regarding Cunningham's mental residual functional capacity;

2. Substantial evidence does not exist in the record to support the ALJ's finding that Cunningham was able to return to his past relevant work as an assembler; and

3. Substantial evidence does not exist in the record to support the ALJ's finding that Cunningham was not disabled under the Act and was not entitled to DIB or SSI benefits.

# RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Cunningham's and the Commissioner's motions for summary judgment, vacate the Commissioner's decision denying benefits and remand Cunningham's claims to the Commissioner for further consideration.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2010):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Samuel G. Wilson, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     February 4, 2011.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE